# IN THE OREGON TAX COURT

LINCOLN COUNTY and
Carl A. Sanders, Lincoln County Assessor

*v.*

# DEPARTMENT OF REVENUE

*and*

Homer Davis, Bruce Holt, Walter L. Behrens,
C.W. & Son, Inc., Charma Chappell,
Henry Gerdes, Suk Young Lee, Sea Trek
and Albert Swynenburg,

*Intervenors.*

(TC 2578)

Wayne Belmont, Lincoln County Counsel, Newport, represented plaintiffs.

Marilyn Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Steven M. Cyr, Cyr, Moe & Benner, P.C., Portland, represented intervenors.

Decision rendered March 1, 1988, setting forth the value of land only under ten oceanfront motels.

### CARL N. BYERS, Judge.

This unusual and complex case concerns the value of land only under ten oceanfront motels in Lincoln City. The case is unusual because, after the taxpayers prevailed at the Department of Revenue hearing and the assessor had appealed to this court, plaintiffs and defendant stipulated to values substantially higher than those found by the department in its Opinion and Order Nos. 85-3119 through 85-3129. The taxpayers intervened to protect their interests in maintaining the properties at the lower values found by the department. With this posture, intervenors have essentially become the appealing parties and bear the burden of persuasion.

The case is complex due to the diversity of the issues raised by the parties, as well as the number of properties involved. In connection with the issue of true cash value, the parties are in disagreement as to the size of the parcels; what is to be included in the land value; the appropriate methods and measures for establishing true cash value; and the application of the concept of highest and best use under the assessment statutes. In addition, intervenors allege and seek relief on the grounds of lack of uniformity and bad faith conduct of the plaintiffs.

All of the properties are located in Lincoln City, north of the D River and all front on the ocean. Some of the properties have direct access to the beach and others do not, however the evidence indicated that the degree of access is not as important as the view. Except for the Sailor Jack Motel, which is zoned RM (residential multiple), all of the properties are zoned RC (residential-commercial). All of the properties are adequately served with streets and utilities. Other aspects or characteristics of the properties may vary but the differences are not significant, except as specifically mentioned.

Before discussing the appraisal evidence, it is necessary to first dispose of the related issues mentioned above. Two of those issues arise from the assessment statutes. ORS 308.215(1) specifies the contents of the assessment roll and provides for the separate listing of land and buildings as follows:

"(e)   The assessed value of the land, excluding all buildings, structures, improvements and timber thereon.

"(f)   The assessed value of all buildings, structures and improvements thereon."

*Development Fees Assessable To Land*

One issue raised by the parties is whether the assessment for the land should include governmentally imposed "development fees."

OAR 150-307.010(1) provides:

"1.   For purposes of ad valorem taxation, the statutory definitions of real property control, whether or not they conform to definitions used for other purposes.

"(2)   Real property includes:

"a.   Land itself, above or under water. This is the original or nonreproducible, indestructible, immobile part of real property. It includes such items or additions thereto as dirt fill, grading, leveling, and drainage. See ORS 308.240, 308.245 for description of land."

In this case, Lincoln City imposes development fees for each residential unit to be created. The development fee is $500 for water, $500 for sewer and $200 for streets, for a total of $1,200 per unit. Consequently, development of a ten-unit motel would cost $120,000 in development fees.

■   It would seem that the fee, based on the number of units, should be allocated to the improvements which constitute the units. However, the uncontested testimony established that the long standing administrative practice has been to include such fees in the land value. There was also testimony to the effect that the benefit continued to run with the land if the improvements were destroyed. A more recently adopted version of OAR 150-307.010(2)(a) appears to adopt the administrative practice. Under these circumstances, the court will not disturb the administrative practice where it falls reasonably within the meaning of the statute. *Allen v.*

*Multnomah County,* 179 Or 548, 173 P2d 475 (1946). It should also be noted that the 1987 Legislature amended ORS 307.010(1) to define land in such a manner as to permit defendant to include such items as the development fees in question. Or Laws 1987, ch 756, § 19. Although this statute was not made retroactive and, therefore, is not applicable to the subject properties for the years in question, nevertheless, it may reflect the legislative intent with regard to the scope or meaning of the preexisting statute. *Kaiser Cement v. Tax Com.,* 250 Or 374, 443 P2d 233 (1968).

*Highest And Best Use*

■     A related issue is whether the current improvements on the land affects the land's fair market value. As noted above, ORS 308.215(1)(e) indicates that land value is to be listed on the roll exclusive of all improvements thereon. This is consistent with the general principle of highest and best use that land should be appraised as if it were "vacant and available." However, where property is improved, the overall highest and best use of the total property must be determined on the basis of the use as improved.

> "The definitions of highest and best use indicate that there are two types of highest and best use. The first type is highest and best use of land or a site as though vacant. The second is highest and best use of a property as improved. Each type requires a separate analysis. Moreover, in each case, the existing use may or may not be different from the site's highest and best use." American Institute of Real Estate Appraisers, *The Appraisal Of Real Estate* 244 (8th ed. 1983).

Earlier on that same page, the point is made that:

> "When a site contains improvements, the highest and best use may be determined to be different from the existing use. The existing use will continue unless and until land value in its highest and best use exceeds the sum of the value of the entire property in its existing use and the cost to remove the improvements." *Ibid.* 244.

Thus, where land is improved, the assessor must consider the highest and best use of the total property but allocate a portion of that total value to the land as though it were vacant. In this case, the issue arises in two ways. Consider first the example of an oceanfront RC lot of 100′ × 100′ in dimension. The evidence indicated that as a site for a single family

residence the land has a typical value of approximately $78,000. However, the same land vacant would have a value of $135,000 as a site for a condominium or motel. How should such land be valued on the roll? The answer is: If the market indicates that the highest and best use of the vacant land is for a motel or condominium, then that is the value which should be on the roll. This would result in a penalty or subtraction from the value of the single family improvement. Where land has a more valuable highest and best use vacant than it does with the existing improvements, it is the value of the improvements which diminishes, not the value of the land. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 248 (8th ed. 1983). "The improvements on these sites suffer from external obsolescence, and their values are less than the values of the same improvements on appropriate sites." *Ibid.* 263.

*Nonconforming Improvements*

■          Another aspect of the issue is illustrated by the Sailor Jack Motel which is located on RM land. Because the motel exceeds the legally allowed density, it constitutes a nonconforming use. Appraisal theory holds this as the "one exception" to valuing land as vacant. The existence of the improvements gives the land greater value because the use of the land with the improvements thereon exceeds the use allowed if the land were vacant. Thus, land improved with a nonconforming use has greater value than if that land were vacant. *See* American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 262 (8th ed. 1983).

What value should be assessed to such land under ORS 308.215 (which specifies that the land value listed on the assessment roll must exclude all improvements)? The question arises simply because the statute fails to take into account that a nonconforming use constitutes an exception to the general rule. Since the statute is clear, it must be the lower "vacant" value which is placed on the roll. While the market may attribute more value to such land because of the existing nonconforming use, any such additional value must be allocated and assessed to the improvements. Otherwise, RM land values would become nonuniform. Logically, any value attributable to the nonconforming use depends upon the existence of the nonconforming improvements, not the land. If the

improvements were to be destroyed, the nonconforming use would end and the land would revert to its RM use limits.

*Appraisal Evidence*

Intervenors had three appraisers, defendant one. All of the appraisers used the market comparison approach and all were in agreement that the highest and best use of the subject properties are their current uses. In the court's opinion, for reasons given below, Carlson and Hansen provided the court with the best evidence. Both of these appraisers agreed upon a 100-foot depth as standard for oceanfront property. Both agreed that the subject properties had to be considered on a front foot as well as a square foot basis. However, they disagreed on which sales were comparable and how those sales should be adjusted.

Carlson found, based on his comparable sales, that the front foot values for the subject properties range from $700 to $1,450 per front foot. He also considered the square foot value for the total area in the subject parcels. It is not clear how he used the Department of Revenue's depth tables to adjust for depth. The court does not believe that these tables are meaningful unless they are related to market data, which they were not.

Hansen found, based on his comparable sales, a standard value of $1,350 per front foot plus $5.25 per square foot for "excess land." Excess land constitutes that square footage in excess of 100 feet of depth. This appraiser developed his per square foot factor based on his own depth study. Although the study data is not in evidence, the appraiser testified as to the methods used and the conclusions arrived at.[1] Hansen also adjusted his sales for time based upon a number of double sales which generally indicated an upward trend.

Intervenors had two other appraisers testify. Mr. Foster, who used twelve comparable sales, appraised the subject properties on a square foot basis. He used the front foot factor only as a cross-check because he saw too much variance in the front foot indications. The court has two major problems with this appraiser's testimony. First, while he adjusted

---

[1] The court sustained intervenors' objections to defendant's offer of Exhibit J, Mr. Hansen's depth study, for failure to comply with Tax Court Rule No. 56.

his comparable sales for time, those adjustments were not consistent. Second, he appeared unable to explain adjustments made to various properties except to say that they were "arbitrary." His testimony left the court with the impression that he had adjusted comparable sales to achieve a preconceived result. Adjustments should not be arbitrary or unexplainable.

Intervenors' third appraiser, Mr. Proctor, testified that he relied upon the comparable sales and other information furnished to him by Carlson. It did not appear that he verified any of this information. Proctor also adjusted for riprap which, based on the evidence adduced, did not appear to be a factor as of the assessment date. To the contrary, Hansen testified that the presence, absence, or need for riprap did not appear evident in any of the comparable sales. In the court's view, Proctor relied heavily on his extensive experience in arriving at his judgment as to the appropriate dollar value per square foot. This generalized approach is not of great value to the court in analyzing and weighing the evidence. It appears to the court that Proctor's role was to lend weight to intervenors' position by a "me too" approach rather than by any new analysis.

The court finds that the preponderance of the evidence supports Hansen's values for oceanfront property of $1,350 per front foot for the first 100 feet of depth, plus $5.25 per square foot on the excess land. This appears reasonable for all of the subject properties except the Sailor Jack. In arriving at this conclusion, the court is impressed that Carlson and Hansen used two of the same sales, both in the immediate area, one sale at $1,845 per front foot and the other at $2,275 per front foot unadjusted. While Carlson adjusted these sales to $1,230 per front foot and $1,431 per front foot respectively, Hansen adjusted them to $1,389 per front foot and $1,793 per front foot. In considering the other sales, the court notes that most of Carlson's sales were not zoned the same as the subject and that most of Hansen's sales were not in the immediate area. Sales in areas like Little Whale Cove are not comparable to the subject properties. Other observations should be made. While Hansen made a time adjustment upward, Carlson believed the trend was down. The problem is, Carlson had no evidence or sales to cite in support of his opinion. Also, Carlson questions the $5.25 per square foot for excess land, but

submitted no evidence to rebut that conclusion. After study of Carlson's appraisal report, the court is unable to tell whether his use of the depth tables would derive a different result. Hansen submitted the only direct evidence on this point.

Although the court has applied the standard front foot factor and the excess square foot factor to the Sailor Jack property, some adjustment should be made for the lesser zoning (RM) and the shallowness of the property. After considering all of the evidence, the court finds that the overall value should be adjusted down 25 percent to account for these factors.

*Parcel Size*

As noted earlier, the parties disagree as to the size of the parcels in question. This dispute is due in part to the fact that the maps used by the assessor were not updated or considered accurate. This may best be illustrated by looking at the Rampside Motel property where a street has been vacated on one side, a street encroaches on the other and the property suffers erosion. After considering the evidence submitted with regard to sizes of the properties, the court finds that the Richie surveys are the most accurate information for those parcels surveyed by him. For the balance of the properties, the court accepts Carlson's measurements. Hansen did not appear to adequately adjust for erosion or unuseable areas for some of the properties, which the court believes should have been done.

Based upon the above findings, the court finds that the true cash value for the subject properties on January 1, 1985, is as follows:

|  | Bare Land | Develop- ment Fees | Total True Cash Value |
|---|---|---|---|
| **Beachfront Motel** 85 fft.@ $1350 8,086 sq. ft. | $114,750 | $ 7,200 | $121,950 |
| **Lincoln Lodge** 100 fft.@ $1350 10,825 sq. ft. +825 excess sq. | $135,000 | | |

|  |  |  |  |
|---|---|---|---|
| ft. @ $5.25 | 4,331 | | |
| | $139,331 | 8,400 | $147,730 |
| **Red Carpet Inn** | | | |
| 150 fft. @ $1350 | $202,500 | | |
| 20,960 sq. ft. | | | |
| +5,960 excess sq. | | | |
| ft. @ $5.25 | 31,290 | | |
| | $233,790 | 42,000 | $275,790 |
| **Nordic Motel** | | | |
| 250 fft. @ $1350 | $337,500 | | |
| 44,000 sq. ft. | | | |
| +19,000 excess sq. | | | |
| ft. @ $5.25 | 99,750 | | |
| | $437,250 | 62,400 | $499,650 |
| **Seahorse Motel** | | | |
| 200 fft. @ $1350 | $270,000 | 26,400 | $296,400 |
| 18,150 sq. ft. | | | |
| **Billows Motel** | | | |
| 100 fft. @ $1350 | $135,000 | | |
| 13,850 sq. ft. | | | |
| +3,850 excess sq. | | | |
| ft. @ $5.25 | 20,212 | | |
| | $155,212 | 8,400 | $163,612 |
| **Coho Inn** | | | |
| 250 fft. @ $1350 | $337,500 | | |
| 41,340 sq. ft. | | | |
| +16,340 excess sq. | | | |
| ft. @ $5.25 | 85,785 | | |
| | $423,285 | 61,200 | $484,485 |
| **Seagull Motel** | | | |
| 135 fft. @ $1350 | $182,240 | | |
| 18,640 sq. ft. | | | |
| +5,140 excess sq. | | | |
| ft. @ $5.25 | 26,985 | | |
| | $209,235 | 28,800 | $238,035 |
| **Rampside Motel** | | | |
| 100 fft. @ $1350 | $135,000 | | |
| 11,730 sq. ft. | | | |
| +1,730 excess sq. | | | |
| ft. @ $5.25 | 9,082 | | |
| | $144,082 | 8,400 | $152,482 |

Sailor Jack Motel
195.87 fft. @ $1350      $264,424

15,417 sq. ft.
Less 25% adj. for
    zoning and depth    - 66,106
                          $198,318     50,400   $252,900

*Uniformity*

Intervenors' second amended answer alleges lack of uniformity in the assessment of oceanfront land. In attempting to seek relief on these grounds, intervenors have a heavy burden. The law requires only relative uniformity, which may be had by following the basic rules for taxation. One of those basic rules is that property be valued at its true cash value. As expressed by the Oregon Supreme Court, the "test" of relative uniformity is:

> "[I]f the property is not assessed for more than its true cash value, and if the assessment is reasonably proportionate to assessed valuation of similar properties in the county, the assessment does not violate any constitutional or statutory provisions." *Robinson et ux v. State Tax Com.*, 216 Or 532, 536, 339 P2d 432 (1959).

In order to prevail in this case, intervenors must show "arbitrary and systematic discrimination" which has resulted in "widespread relative nonuniformity." *Meadowland Ranches v. Dept. of Rev.*, 277 Or 769, 776, 562 P2d 183 (1977). The evidence disclosed that the assessor had two basic classes of oceanfront land. One class, for motels, was assessed at either $19 per square foot or $250,000 per acre. The second class, consisting primarily of single family residential properties, was valued at $71,000 per site, with larger sites adjusted for size.

Intervenors contend that nonuniformity exists on two points:

First, the obvious inequity of valuing the same kinds of land at either $19 per square foot or $250,000 per acre. At $19 per square foot, land would be valued at $827,640 per acre while land valued at $250,000 per acre is the equivalent of $5.74 per square foot. Intervenors established that there is no valid reason for valuing motel land at $250,000 per acre since there were no sales to support that figure and there was no

logic to support the use of that measure. Moreover, intervenors' evidence showed that the per acre measure was applied in one case to a small parcel, while a per square foot measure was applied to a larger parcel. As a result, some motels are clearly underassessed.

However, these clear errors by the assessor do not appear sufficiently widespread or systematic to constitute unconstitutional nonuniformity. Moreover, intervenors do not seek an order equalizing the values of all the oceanfront motels in the county. Rather, the only relief sought by intervenors is to reduce the value of the subject parcels. In the absence of widespread or systematic nonuniformity, the court will not reduce the assessed values of the subject properties below their true cash values. The court does strongly admonish plaintiffs to consistently apply the methods approved herein in determining the value of all oceanfront motel land in Lincoln County. To do otherwise creates inequities and further public disgruntlement with the ad valorem tax system.

Second, intervenors' contend that the lack of uniformity is based upon plaintiffs' failure to treat all oceanfront property the same. For example, if two adjacent parcels of oceanfront land, each 100 feet square, are improved, one with a residence and the other with a motel, the land under the residence should have the same value as the land under the motel. Intervenors are correct *if* the highest and best use for the site under the residence is as a motel. The problem in this case is that the evidence did not establish that the highest and best use of every oceanfront land parcel is either for a motel or condominium. It is a question of market demand. The plaintiffs' evidence indicated that a typical residential site sells for $71,000. Intervenors' sales did not show differently. In fact, analysis of Carlson's comparable sales appear to verify this typical site value. It must be remembered that it is market demand which determines highest and best use, not whether the parcels are adjacent to another.

*Attorney Fees*

Intervenors' second amended answer also alleges entitlement to attorney fees due to plaintiffs' lack of good faith and obstructionist tactics. Intervenors recognize that no statute or contract provides for the award of attorney fees here but contend that the court has inherent powers to award them.

However, intervenors failed to establish their claims of bad faith and obstructionism. What intervenors did show, in the court's opinion, is that the assessor's office inherited some problems which it then made worse instead of better. It would also appear that the assessor's office may need training in public relations and communicating. However, none of these inadequacies, which may exist for reasons beyond plaintiffs' control, merit the award of attorney fees in this case.

Judgment will be entered in accordance with the above findings of the court. Costs to neither party.