IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DESCHUTES COUNTY ASSESSOR, )
 )
 Plaintiff, ) TC-MD 170099N
 )
v. )
 )
JOHN LESZAR and PAMELA J. LESZAR, )
 )
 Defendants. ) **FINAL DECISION**[1]

Plaintiff (the County) appeals the real market value of property identified as Account

205528 (subject property) for the 2016-17 tax year. A trial was held in the Jill A. Tanner

Mediation Center on July 25, 2017, in Salem, Oregon. Todd Straughan (Straughan), Senior

Appraiser, appeared and testified on behalf of the County. Defendants (Taxpayers) appeared on

their own behalves. John Leszar (Leszar) testified on behalf of Taxpayers. The County's

Exhibits 1 to 3 and Taxpayers' Exhibits A to F were received without objection.

## I. STATEMENT OF FACTS

The subject property is a 2,292-square-foot, single-level home located in the "ridge side"

of the Eagle Crest Resort community (Eagle Crest). (Ptf's Ex 1 at 1.) Eagle Crest is west of

Redmond and northwest of Bend. (*Id.*) The subject property was "custom built" in 2015 on a

0.23 acre lot.[2] (*Id.*) It also included a 796-square-foot, two-car garage with a shop area. (*Id.* at

1, 8.) Straughan determined that the subject property's improvements were average quality for

the area. (*Id.* at 1.) He testified that the subject property is a class 5 house.

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered December 20, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] Straughan testified that a "custom built" home is one that is not a "spec home."

A.    *Subject Property Market*

Straughan testified that the subject property's location within Eagle Crest is significant because some homes are closer to the golf course and some have mountain views. He testified that the subject property is located farthest from the golf course and has "limited views." (*See* Ptf's Ex 1 at 1.) Straughan testified that the subject property is located on Juniper Glen Circle, which is a specific neighborhood within Eagle Crest and includes 47 lots. (*See id.* at 3.) He testified that the overall market in Eagle Crest was good as of January 1, 2016, and had been increasing over several prior years. (*See id.*) According to the Beacon Report, written by the Beacon Appraisal Group in Redmond, the median home price in Redmond increased 15 percent per year from January 2012 to January 2016; specifically, from $100,000 to $250,000. (*Id.* at 3.) Straughan analyzed sales data from the Central Oregon Multiple Listing Service for Juniper Glen Circle and found the average sales price for January 2011 to January 2012 was $345,600 compared with $483,330 for January 2015 to January 2016, a 7.5 percent annual increase. (*Id.*)

Leszar testified that he agreed with Straughan that sales are "skyrocketing" and "lots are hard to get." He testified that the County applied a time trend of one percent per month in an appraisal submitted to the Board of Property Tax Appeals (BOPTA), as contrasted with 7.5 percent per year in Straughan's appraisal submitted to the court. (*See* Defs' Ex E at 4.)

B.    *The County's Real Market Value Evidence*

1.    *Cost Approach*

Straughan testified that he relied upon Taxpayers' actual construction costs of $296,377 for his cost approach. (*See* Ptf's Ex 1 at 3, Ex 2.) The residential construction agreement was entered into on January 27, 2015, for a cost of $293,456. (Ptf's Ex 2 at 1.) Straughan testified that he could not determine whether those costs included onsite developments (OSDs), so he

added $18,000 for the subject property's OSDs based on the County's study for the Ridge at Eagle Crest. (*See* Ptf's Ex 1 at 4-6.) Straughan testified that he did not include the cost of landscaping because the subject property had no landscaping as of January 1, 2016. (*See id.* at 5.)

Taxpayers purchased the subject property's land for $60,000 in June 2014. (*See* Ptf's Ex 1 at 4.) Straughan reasoned that the subject property's land value as of January 1, 2016, would exceed $60,000 because the market had been increasing since Taxpayers' purchase. To determine the real market value of the subject property's bare land, Straughan considered six land sales from Eagle Crest, three of which were located on Juniper Glen Circle. (*See id.*) He placed the most weight on the three lots on Juniper Glen Circle, which were a sale of 0.29 acres that sold for $90,000 in July 2016; a sale of 0.22 acres that sold for $79,000 in April 2016; and a sale of 0.28 acres that sold for $90,000 in August 2015. (*See id.*) From those sales, Straughan concluded the subject property's bare land value was $85,000 as of January 1, 2016. (*See id.*) Straughan testified that he gave equal weight to his three land sales on Juniper Glen Circle; he did not think the market would distinguish between 0.23 acres and 0.28 or 0.29 acres.

Straughan concluded a real market value of $399,377 under the cost approach. (Ptf's Ex 1 at 5.) However, he testified that he placed no weight on the cost approach because, in a rapidly increasing market such as the subject property's market, the market value of property exceeds its cost. Straughan testified that the County observed similar market conditions during the real estate bubble preceding 2008; everyone was building and selling houses. He testified that, from 2015 to 2016, about 40 new homes were built in Eagle Crest. (*See id.* at 4.)

Leszar testified that Taxpayers' actual construction costs included OSDs. (*See* Defs' Ex A at 8 (itemized costs).) He testified that he took issue with the County's OSD study because

it was based on a conversation with only one person. (*See* Defs' Ex C at 1-2.) Leszar testified that he thought Straughan's three land sales on Juniper Glen Circle were good comparable sales, but he disagreed with Straughan's land value conclusion. He testified that he could distinguish between lots in the size range of 0.23 to 0.29 acres. Leszar testified that the buyer of land sale 2, a builder, paid "a premium" because he needed another lot.

2.  *The County's Sales Comparison Approach*

Straughan testified that he thought it was "imperative" to stay within the Juniper Glen Circle area of Eagle Crest when selecting comparable sales. (*See* Ptf's Ex 1 at 7.) He testified that he found 14 sales within 0.25 miles of the subject property that sold between January 1, 2015, and July 5, 2017. (*See id.*) The sale prices ranged from $420,000 to $695,000, with the low end being a 2003-built property that was not comparable to the subject property. (*See id.*) Straughan presented his sales comparison grid with four comparable sales, three of which were located on Juniper Glen Circle and the fourth on Highland Meadow Loop. (*Id.* at 8.) He testified that, first, he adjusted his sales for time using a trend of 7.5 percent per year. Straughan adjusted $86 per square foot for living space, which was two thirds of the construction cost of $129 per square foot. (*See id.* at 9.) He adjusted $5,000 per full bathroom and $2,500 per half bathroom. (*See id.*) Straughan adjusted $5,000 per car stall in the garage. (*See id.*) He testified that the subject property is a class 5 home and, to the extent it differed from his comparable sales, he accounted for that in the quality adjustment. (*See id.*) Straughan adjusted for landscaping based on the Plaintiff's study for Eagle Crest. (*See id.*) His adjusted sale prices ranged from $440,250 to $454,450. (*See id.* at 8.) The average price was $445,600, and Straughan concluded a real market value of $445,000 for the subject property. (*See id.* at 10.)

/ / /

3.  *The County's Reconciliation*

Straughan testified that he did not think that the income approach was relevant because rental properties in Eagle Crest do not "pencil." He relied entirely on the sales comparison approach and concluded a real market value of $445,000, the value requested. (Ptf's Ex 1 at 16.)

C.  *Taxpayers' Real Market Value Evidence*

1.  *Taxpayers' Cost Evidence*

Leszar testified that the actual cost of the subject property improvements was $296,337, or $129.92 per square foot. (*See* Defs' Ex A at 1.) He testified that the subject property permits were based on an improvement value of $294,478, or $128.48 per square foot. (*See id.* at 3.)

2.  *Taxpayers' Comparable Sales*

Leszar testified that he performed a "layman's appraisal" with comparable sales. (*See also* Defs' Ex A at 1.) He identified eight sales in Eagle Crest that occurred in the last half of 2015, with an average price of $174.11 per square foot. (*See id.* at 1, 4.) That price indicates a value of $399,060 for the subject property. (*Id.* at 4.) The houses Leszar identified were built between 2000 and 2015 and only one was located on Juniper Glen Circle. (*Id.*) The house on Juniper Glen Circle, which was built in 2015, sold for $219.51 per square foot. (*Id.*)

3.  *The County's Assessment Records and Methodology*

Leszar testified that Taxpayers petitioned BOPTA because they thought the County's valuation methodology for the subject property was inconsistent with other homes. (*See* Defs' Ex A (Taxpayers' evidence submitted to BOPTA).) Taxpayers provided a comparison of the prices per square foot used by the County to establish the real market values of five houses built in 2015.[3] (Defs' Ex B at 1.[4]) The total prices ranged from $150.12 to $174.31 per square foot,

_____

[3] Leszar testified that one property's record stated it was built in 2014, but that appeared to be a typo. (*See* Defs' Ex B at 8.) Exception value was added for the 2016-17 tax year. (*See id.* at 7.)

with an average of $161.54 per square foot. (*Id.*) Leszar testified that the County used $199.55 per square foot for the subject property. (*See id.*) A price of $161.54 indicates a value of $370,250 for the subject property. (*See id.*) The five houses were all located on Highland Meadow Loop, which Leszar testified is within 800 feet of the subject property, across William Lyche Drive. (*See id.* at 1-2.) He testified that, like the subject property, all of the other houses were class 5 or 5+. (*See id.* at 3-21.) Leszar testified that the houses on Highland Meadow Loop were on larger lots than the subject property; generally about 0.3 to 0.32 acres. (*See id.* at 1.)

Leszar provided copies of the County's appraisal records for the five houses on Highland Meadow Drive and for the subject property. (*See* Def's Ex B.) He testified that, for properties on Highland Meadow Loop, the County used a land trend of 143 percent; an improvement trend of 105 percent[5]; and a local cost modifier of 135. (*See id.* at 4, 7, 10, 17.) Leszar testified that, by contrast, the County used a land trend of 109 percent; an improvement trend of 139 percent; and a local cost modifier of 135 for the subject property. (*Id.* at 20.) He testified that he did not understand why the County applied a trend of 139 percent to the subject property's improvement, whereas a lower trend was applied to similar properties only 800 feet away. Leszar testified that he asked the County representatives and they could not explain the difference.

Straughan provided the County's appraisal records for his comparable sales on Juniper Glen Circle. (*See* Ptf's Ex 3.) The County applied a 139 percent trend to each of the properties on Juniper Glen Circle. (*See id.*) Straughan testified that the County annually trends properties by comparing actual sales prices with tax roll values. Properties are grouped by neighborhoods

---

[4] This exhibit is the same as that which Defendants presented to BOPTA, except for the inclusion of a fifth new house on Highland Meadow Loop. (*See* Defs' Ex A at 5.)

[5] Leszar testified that the improvements trend was 105 percent and handwrote that number on the exhibits, but the printed number in Plaintiff's records is 104 percent. (*See* Defs' Ex B at 5, 8, 11, and 18.)

and then adjusted by trends. Straughan testified that Highland Meadow Loop is a different neighborhood than Juniper Glen Circle. He testified that the lower trend applied to Highland Meadow Loop suggests that the sales analyst either found the sales data was lacking or that sale prices were relatively closer to tax roll values as compared with Juniper Glen Circle, which received a higher trend.

Straughan testified that the County's real market values for properties on Juniper Glen Circle are correct based on a comparison to actual sales prices: $442,500 sale price vs. $420,400 real market value; $455,000 sale price vs. $472,930 real market value; and $439,900 sale price vs. $423,480 real market value. (Ptf's Ex 3.) The real market values of Juniper Glen Circle properties ranged from $199.92 to $223.93 per square foot. (*See id.*) Straughan testified that, based on Taxpayers' evidence, the Highland Meadow Loop real market values may be too low, which the County would address in the future. He clarified that the 139 percent trend used in the County's mass appraisal of properties on Juniper Glen Circle is distinct from the 7.5 percent annual trend that he derived from market evidence and used in his sales comparison approach.

D.      *Tax Roll and BOPTA Values*

The County determined that the 2016-17 tax roll real market value for the subject property was $457,370, of which $386,740 was exception value based on the new house and OSDs. (*See* Ptf's Ex 1 at 2.) The County determined the 2016-17 maximum assessed value and assessed value was $414,800. (*See id.*) BOPTA reduced the 2016-17 real market value to $376,800, of which $316,800 was exception value. (*See id.*) BOPTA reduced the 2016-17 maximum assessed value and assessed value to $353,470. (*See id.*) The County asks the court to increase the subject property's real market value to $445,000. Defendants ask the court to sustain BOPTA's values.

## II. ANALYSIS

The first issue before the court is the subject property's real market value for the 2016-17 tax year. A second issue, raised by Taxpayers', is whether the 2016-17 real market value of the subject property is uniform within the same class of properties.

"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427.[6] A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). A party seeking affirmative relief must provide competent evidence of real market value. *See Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor,* TC–MD 110300D at 7 (Mar 13, 2012). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

With respect to the first issue, real market value, the County is the party seeking affirmative relief and therefore bears the burden of proof. With respect to the second issue, whether the subject property's real market value is uniform within the same class of properties, Taxpayers seek affirmative relief and therefore bear the burden of proof.

/ / /

/ / /

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

A.      *Real Market Value*

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor,* TC–MD 020869D, WL 21263620 at *2 (Mar 26, 2003).  Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2016-17 tax year was January 1, 2016.  *See* ORS 308.007, 308.210. Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *."  ORS 308.205(2).  The three approaches of value that must be considered are: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach.  *Former* Oregon Administrative Rule (OAR) 150–308.205–(A)(2)(a) (2016), *renumbered as* OAR 150–308–0240-(A)(2)(a) (2017).  Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

Both parties agreed that the two relevant approaches to valuing the subject property as of January 1, 2016, were the cost approach and the sales comparison approach.  In reaching his real market value conclusion, Straughan placed weight entirely on the sales comparison approach because he found houses in the subject property's market were selling above cost.

1.      *Cost Approach*

Under the cost approach, the real market value of a property is determined "by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006), quoting Appraisal Institute, *The Appraisal of Real Estate* (12th ed 2001) (alternation in original) (internal quotation marks

omitted). The cost approach is especially persuasive when, as here, the subject property improvements are relatively new. *See id.* at 55.

The first step is to determine the subject property's land real market value. Taxpayers purchased the subject property land for $60,000 in June 2014. Market prices increased between June 2014 and January 2016, indicating that value was too low as of January 1, 2016. Straughan presented six comparable land sales from Eagle Crest, three of which were located on Juniper Glen Circle like the subject property. Leszar agreed that those sales were comparable to the subject property. The three land sales were 0.29 acres that sold for $90,000; 0.28 acres that sold for $90,000; and 0.22 acres that sold for $79,000. The subject property is 0.23 acres. Straughan concluded a value of $85,000 for the subject property land. Leszar considered that value too high, noting that the two lots that sold for $90,000 were larger than the subject property. The court agrees with Leszar and finds a land value of $80,000 is supported based upon the evidence.

The next step is to add the value of improvements. Both parties relied upon Taxpayers' actual construction costs of $296,377, which included OSDs. Adding the actual improvements cost to the land value yields a total value of $376,377 under the cost approach.

It is worth noting here that the real market value indicated under the cost approach is likely understated as of January 1, 2016. The residential construction agreement was entered into on January 27, 2015, nearly one year before the January 1, 2016, assessment date. Both parties acknowledged that the market was rising during that time period.

2. *Sales Comparison Approach*

Under the sales comparison approach, "only actual market transactions of property comparable to the subject property, or adjusted to be comparable," may be used and all sales

/ / /

"must be verified to ensure they reflect arms-length market transactions." *Former* OAR 150–308.205–(A)(2)(c) (2016), *renumbered as* OAR 150-308-0240 (A)(2)(c) (2017).  To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3.

Straughan relied upon four sales from the ridge side of Eagle Crest, three on Juniper Glen Circle and the fourth on Highland Meadow Loop.  Three of the four properties were newly constructed, like the subject property.  After making adjustments, his sales indicated prices ranging from $440,250 to $454,450, with an average price of $445,600.  Straughan concluded a real market value of $445,000 for the subject property.  The court finds Straughan's sales comparison approach persuasive because the properties he selected are similar to the subject and proximately located.  Straughan's adjustments are reasonable and adequately supported.

Leszar performed what he termed a "layman's appraisal," in which he considered eight sales in Eagle Crest that occurred in the latter half of 2015.  He found the average price of those sales was $174.11 per square foot, which indicates a value of $399,060 for the subject property.  The court is not convinced by Leszar's "layman's appraisal" because the properties differ from the subject property in size, age, and perhaps other relevant characteristics, yet Leszar did not adjust for those differences.  As a result, the court places no weight on Leszar's conclusion.

3.      *Real Market Value Reconciliation*

The cost approach indicates a real market value of $376,377.  The sales comparison approach indicates a real market value of $445,000.  Given the active market for properties in the subject property's neighborhood, the court agrees with Straughan that more weight should be placed on the sales comparison approach.  However, the court finds some weight should be

/ / /

placed on the cost approach because the subject property was new as of January 1, 2016. The court concludes that the subject property's real market value was $428,000 as of January 1, 2016.

B.      *Uniformity*

Notwithstanding the real market value evidence discussed above, Taxpayers challenge the real market value assigned to the subject property by the County because the County "was not consistent in their methodology for determining the Real Market Value for the subject property when compared with nearly identical properties constructed in the same year and located within a quarter mile of the subject." (Ans at 1.) The County disagrees with the relevance of the real market values assigned to the subject property as compared with neighboring properties, urging the court to instead focus on real market value based on comparable sales. (*See* Ptf's Ex 1 at 2.) The County maintains that BOPTA erred by considering such evidence. (Compl at 1.)

Article I, section 32, of the Oregon Constitution states, in part, that "all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Article IX, section 1, of the Oregon Constitution states that "[t]he Legislative Assembly shall, and the people through the initiative may, provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the State." [7] Pursuant to Article XI, section 18, of the Oregon Constitution, the uniformity requirements contained in Article I, section 32, and Article IX, section 1, do not apply to Article XI, section 11, which established the concept of maximum assessed value. *See also Ellis v. Lorati*, 14 OTR 525, 535 (1999) (observing that the concept of maximum assessed value

---

[7] "With respect to the claim to uniformity or equality of taxation, this court has stated on past occasions that for practical purposes the concept is the same under the relevant provisions of the Oregon Constitution as under the equal protection clause of the fourteenth amendment." *Tharalson v. Dept. of Rev.*, 281 Or 9, 15, 573 P2d 298 (1978).

"may, over time, result in various degrees of nonuniformity in the property tax system. Section 11(18) contemplates this and excuses itself from complying with other constitutional provisions requiring uniformity, specifically Article IX, section 1 and Article I, section 32.").)

After the passage of Measure 50, a taxpayer's claim based on lack of uniformity in the *amount of tax assessed* as compared with neighboring properties is unlikely to succeed because the constitutional provisions requiring uniformity do not apply to maximum assessed value. *See, e.g., Vandiver v. Deschutes County Assessor*, TC-MD 080384D, WL 3876099 at **1-2 (Aug 18, 2008) (holding that the court lacked authority to correct maximum assessed value where the taxpayer paid more property taxes "than a neighboring property with a same year manufactured home"); *Mathers v. Deschutes County Assessor*, TC-MD 110130N, WL 5983312 at **6-7 (Nov 30, 2011) (holding that the court lacked authority to correct maximum assessed value where the taxpayer's maximum assessed value was higher than "neighboring, similar and superior properties"). However, this case does not involve a direct challenge to maximum assessed value or to the amount of property taxes assessed; it concerns real market value.[8] The passage of Measure 50 did not excuse real market value from the requirements of uniformity. *See, e.g., Buckles v. Deschutes County Assessor*, TC-MD 150133D, WL 5682617 at **5-6 (Sept 28, 2015) (holding that the taxpayer met her burden of showing that the real market value of her condominium was not assessed uniformly with the real market values assigned to two identical condominiums in the same development).

/ / /

/ / /

_____

[8] However, because the subject property included new property as of January 1, 2016, a reduction in the real market value of the subject property's improvements will reduce the 2016-17 maximum assessed value of the subject property due to the resulting reduction in exception value. *See* ORS 308.153.

1.      *Requirements of the constitutional uniformity clauses*

"What is required in Oregon is 'relative' uniformity, that is, uniform operation of law,
not uniformity of consequences." *Chart Dev. Corp. v. Dept. of Rev.*, 16 OTR 9, 15 (2001)
(citation omitted). Generally, "relatively uniformity" is achieved through use of the market
value standard. *See Robinson v. Stewart*, 216 Or 532, 536, 339 P2d 432 (1959).

a.      *A property classification must have a rational basis*

"[A] classification, to survive the protections of the uniformity in taxation clauses of the
state constitution, must be based on real differences between the subjects disparately treated by
the classification." *Mathias v. Dept. of Rev.*, 312 Or 50, 59, 817 P2d 272 (1991). It "must be
based on inherent, qualitative, genuine, rational differences between the classes of property to be
accorded different treatment." *Id.* at 60; *see also Chart*, 16 OTR at 15 (stating that "[m]erely
showing that other properties have lower values does not prove the lack of uniformity * * *
because different values could be the result of different features or characteristics and not the
result of the application of a different valuation methodology to apparently similar properties.").
Classifications based on geographical location may be based on "natural qualities"—for
example, swamp land or arid land—or they may be based on "politically imposed qualities" that
result from "economic factors or human conditions." *Jarvill v. City of Eugene*, 289 Or 157, 180,
613 P2d 1 (1980); *see also Brummell v. Dept. of Rev.*, 14 OTR 303, 308 (1998) (explaining that
"[t]he many differences in property such as location, nature, and use may inherently require
employing different methods of estimating value. The law cannot mandate a rule which operates
contrary to economic realities and at the same time require real market value assessments.").

In the realm of property taxation, courts have accepted rational distinctions based upon
market evidence. *See Brummell*, 14 OTR at 308 (accepting different appraisal methodologies for

residential rental properties); *Penn Phillips Lands, Inc. v. Dept. of Rev.* (*Penn III*), 255 Or 488, 468 P2d 646 (1970) (accepting distinctions based on size for otherwise identical tracts of land); *Meadowland Ranches, Inc. v. Dept. of Rev.*, 277 Or 769, 776, 562 P2d 183 (1977) (accepting distinction between farm use land and otherwise identical "recreational" land held for sale). Courts have rejected distinctions based on arbitrary or nonexistent differences between properties. *See Henshaw v. Dept. of Rev.*, 5 OTR 263 (1973) (finding no basis to distinguish between the various property tax accounts comprising a shopping center); *Lincoln County v. Dept. of Rev.*, 11 OTR 5 at 14-15 (1988) (finding "no valid reason" to value land under oceanfront motels at a different unit price than oceanfront land under residential properties, absent market evidence to support that distinction); *Mathias*, 312 Or at 274 (rejecting a statutory classification treating groups of four or more subdivision lots differently than one to three subdivision lots for *ad valorem* tax purposes).

b.       *"Widespread and systematic" nonuniformity violates the constitution*

"[O]nce a taxing authority selects a class for taxation, the tax must apply uniformly among all objects in the class." *Jarvill*, 289 Or 157 at 177-78. However, assuming the value assigned to the property at issue is its market value, courts have declined to find a violation of the constitutional uniformity clauses unless the nonuniformity results from a "widespread and systematic plan of discrimination." *Penn III*, 255 Or at 498; *see also Lincoln County*, 11 OTR at 15 (holding that, "[i]n the absence of widespread or systematic nonuniformity, the court will not reduce the assessed values of the subject properties below their true cash values.").[9] The court in *Penn III* explained that, "if there were a great number of under-assessments, such might lead to a

/ / /

---

[9] The "true cash value" standard was replaced by the "real market value" standard in 1991. *See Gangle v. Dept. of Rev.*, 320 Or 494, 496 n1, 887 P2d 784 (1995).

conclusion that the basic rule of 'true cash value' was not being followed or that there was lack of 'relative uniformity.'" 255 Or at 498.

In *Robinson*, the court found "relative uniformity" was satisfied by the assessment of the taxpayer's office building at its correct market value, even though the taxpayer demonstrated a lower assessment for another office building that was equal if not superior to the taxpayer's building. 216 Or at 537. In *Penn III*, a majority of the Oregon Supreme Court found that the assessor's inconsistent application of its land price schedule was not sufficiently widespread and systematic to violate the constitution where only five out of 25 subdivisions were affected. 255 Or at 495-497. In *Freightliner Corp. v. Dept. of Rev.*, 275 Or 13, 549 P2d 662 (1976), the court upheld an omitted property assessment of the taxpayer's property despite the Department of Revenue's failure to make omitted property assessments in four other similar situations. *Id.* at 16. The court "did not believe that four instances in which omitted property assessments [had] not been levied [was] sufficient evidence of an intentional disregard for the principle of uniformity so as to justify relieving all other taxpayers who are properly subject to such assessments." *Id.* at 20. In *Meadowland*, the court found "relative uniformity" was satisfied despite the assessor's lower assessments for farm use land as compared with "recreational land," where farm use land comprised only two percent of all privately owned land in the county, whereas the recreational land constituted approximately 12 percent of the privately owned land. 277 Or at 775-77. In *Lincoln County*, the court found the "clear errors by the assessor" in distinguishing between various parcels of oceanfront land were "not sufficiently widespread or systematic to constitute unconstitutional nonuniformity." 11 OTR at 15.

Courts have found widespread and systematic nonuniformity where the taxpayer was singled out for disparate treatment. *See Reynolds Metals Co. v. Ellis*, 227 Or 467, 473, 362 P2d

705 (1961) (holding that a taxpayer was entitled to a 20 percent reduction in value applied to all other properties of the same class—industrial machinery and equipment within the county—notwithstanding the taxpayer's written stipulation as to the market value of its property); *see also Penn Phillips Lands, Inc. v. State Tax Comm'n* (*Penn I*), 247 Or 380, 385-86, 430 P2d 349 (1967) (holding that "[t]he action of the assessor in reappraising only the land of this one taxpayer, while leaving identical private land in the surrounding desert appraised at [lower] values * * * resulted in a systematic denial of uniformity to this taxpayer and some form of relief is clearly necessary"); *see also Henshaw*, 5 OTR at 268 (noting "a distinction between an assessor's error in overlooking one or two properties with a resulting underassessment for the few and the situation where one taxpayer is singled out for assessment at full value while all others are left assessed at lesser values.").

         c.        *Remedy for violation of uniformity clauses*

Courts are reluctant to strike down a correct assessment absent a showing of widespread and systemic nonuniformity. *See, e.g., Henshaw*, 5 OTR at 268 (stating "that it would be wrong to strike down a correct assessment merely because one neighbor's property has been underassessed"). In *Robinson*, the court explained that "[i]t would be absurd to reduce plaintiffs' assessment here so as to create an under-assessment because of another under-assessment and thus compound the error the assessor made." 216 Or at 538. In *Penn I*, the Oregon Supreme Court concluded that the Tax Court erred in lowering the taxpayer's property value to less than its market value as a remedy to correct the lack of uniformity. *See Penn Phillips Lands, Inc. v. State Tax Comm'n* (*Penn II*), 251 Or 583, 584-85, 446 P2d 670 (1968). The court determined that the appropriate remedy was a refund to the taxpayer for the tax year at issue calculated based on what the taxpayer's liability would have been if the surrounding properties had been

reappraised at their true market values. *Id.* at 585. In subsequent cases, courts have concluded that lowering the taxpayer's assessment below real market value may be an appropriate remedy. *See Reynolds*, 227 Or at 473 (reasoning that, "[w]here there is a conflict between 'true' value and uniformity of assessment, the requirement of uniformity is paramount to the requirement that property be assessed at its true value."); *see also Henshaw*, 5 OTR at 269 (lowering the taxpayer's assessment to match those of the other shopping center accounts).

2.    *Whether the subject property's real market value violates the uniformity clauses*

Taxpayers presented evidence that houses located on Highland Meadow Loop were assigned lower real market values by the County as compared with houses on Juniper Glen Circle, including the subject property. The values assigned to five houses on Highland Meadow Loop ranged from $150.12 to $174.31 per square foot, with an average of $161.54 per square foot, whereas the subject property's real market value was $199.55 per square foot. Defendants identified the likely reason for the disparate values as the County's different improvement trends; specifically, an improvement trend of 104 percent vs. an improvement trend of 139 percent.

The first question is whether the County had a rational basis for distinguishing between the houses on Highland Meadow Loop as compared with the houses on Juniper Glen Circle, including the subject property. All of the houses identified by Taxpayers were built in 2015 and were class 5 or 5+. They were similar in size to the subject property and situated on slightly larger lots. Thus, none of those factors explain why the real market values would differ. The only explanation provided by Straughan was that the County classifies Highland Meadow Loop and Juniper Glen Circle as different neighborhoods; as a result, the County's sales analyst

/ / /

/ / /

separately determines annual trends for the two neighborhoods.[10] Straughan offered no explanation of why the neighborhood classification would justify different real market values. Both neighborhoods are located within the ridge side of Eagle Crest and Straughan used properties located on Highland Meadow Loop as comparable sales for the subject property without making any location adjustment, suggesting he considered the neighborhoods comparable. On that evidence, the court is convinced that there is no rational basis for distinguishing between houses located on Highland Meadow Loop and on Juniper Glen Circle. The distinction may be a matter of administrative convenience for Plaintiff, but it cannot justify disparate real market values.

As found above, the evidence demonstrated that the subject property's real market value as of January 1, 2016, was $428,000, or $186.74 per square foot, which exceeds the real market values assigned to at least five similar properties on Highland Meadow Loop. The next question is whether that lack of uniformity is sufficiently "widespread and systematic" to violate the uniformity clauses of the Oregon Constitution. Recall that courts have found a violation where one taxpayer was singled out for disparate treatment, but not otherwise. On rebuttal, the County presented evidence of three other properties on Juniper Glen Circle to which the County applied

---

[10] "Due to limitations of time and money, assessors are unable to physically reappraise every property every year. To comply with the statutory mandate that properties be assessed at their real market value every year, assessors apply a trend factor to increase or decrease assessed values to reflect trends in inflation or deflation. The trends are determined by ratio studies. A ratio study is a statistical analysis of the relationship between the sale prices of properties and their assessed values. Accuracy of the study depends upon classification of the properties, whether available sales are representative of the class, and a number of other factors." *Niemeyer v. Dept. of Rev.*, 14 OTR 34, 35 (1996); *see also Clackamas County Assessor v. Village at Main Street Phase II, LLC*, 349 Or 330, 333 n4, 245 P3d 81 (2010) (explaining that, when taxable property is not physically appraised, county assessors apply a ratio to equalize the real market values of comparable property in a "process called 'trending.' ").

The Department of Revenue is required to annually examine the certified ratio study prepared by each county assessor to ensure that it complies with ORS 308.232, which in turn requires all real or personal property not exempt or subject to special assessment to be valued at 100 percent of its real market value. *See* ORS 309.203(2). The department is required to order adjustments to real market value to result in compliance with ORS 308.232 where it finds certain deviations from real market value within the ratio study. *See* ORS 309.203(2)(a), (b). In this case, Plaintiff's certified ratio study was not submitted into evidence and the court received no evidence that the Department of Revenue made adjustments to Plaintiff's certified ratio study.

the same improvements trend (139 percent) as to the subject property, resulting in real market values ranging from $199.92 to $223.93 per square foot for those properties. On that evidence, the court cannot conclude that the subject property was singled out for disparate treatment.

As Straughan testified, it appears that the County's real market values assigned to properties on Juniper Glen Circle are relatively accurate, whereas properties on Highland Meadow Loop may be undervalued. The court has concluded that the subject property's 2016-17 real market value was $428,000. The court cannot strike down an accurate assessment absent evidence of widespread and systematic nonuniformity, which is not demonstrated by the evidence here.

### III. CONCLUSION

After careful consideration, the court concludes that the subject property's 2016-17 real market value was $428,000. Its exception real market value (new improvements and OSDs) was $348,000. The court further concludes that the subject property's 2016-17 real market value meets the requirement of relative uniformity under the Oregon Constitution. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2016-17 real market value of property identified as Account 205528 was $428,000, and its 2016-17 exception real market value was $348,000.

Dated this ___ day of January, 2018.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on January 9, 2018.*